# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| UTILISAVE, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 10729-VCP |
| | ) | |
| DONNA C. MIELE, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted:  May 12, 2015
Date Decided:  September 17, 2015

John G. Harris, Esq., BERGER HARRIS LLP, Wilmington, Delaware; *Attorneys for Plaintiff*.

Joanne P. Pinckney, Esq., Elizabeth Wilburn Joyce, Esq., PINCKNEY, WEIDINGER, URBAN & JOYCE LLC, Wilmington, Delaware; *Attorneys for Defendant*.

**PARSONS, Vice Chancellor.**

This is an action by a Delaware limited liability company ("LLC") against a former member and employee for breach of a confidentiality provision in the LLC operating agreement. The LLC claims to own valuable confidential information, including trade secrets. The former member and employee was a senior executive of the LLC who allegedly had access to its confidential information. A few months after the defendant resigned as an employee in late 2014, she allegedly began to compete with the LLC. Thereafter, the plaintiff filed this action against the defendant for specific performance of the confidentiality provision and damages. This motion currently is before me on the defendant's motion to dismiss.

For the reasons that follow, I deny the defendant's motion as to the plaintiff's claim for equitable relief and grant it as to the plaintiff's claim for monetary damages. Taking all well-pled allegations of fact as true and drawing all reasonable inferences in favor of the plaintiff, the complaint pleads only one non-conclusory breach of the confidentiality provision at issue. As to that alleged breach, I conclude the defendant failed to carry her burden of proving that the contract was invalid or unenforceable as a matter of law. I also conclude that it is reasonably conceivable that the plaintiff could prove that the confidentiality provision survived a court ordered termination of the LLC and that the restrictions it imposes on the defendant are not overly broad or unreasonable as a matter of law.

1

## I.    BACKGROUND[1]

### A.    The Parties

Plaintiff, UtiliSave, LLC (the "Company"), is a limited liability company formed under the laws of the State of Delaware.  Michael H. Steifman, currently the sole owner and manager of the Company, founded UtiliSave in 1991.  UtiliSave has been and continues to be an innovator and industry leader in the business of auditing the utility bills of large institutions such as universities and hospitals.  UtiliSave collects tens of millions of pieces of data regarding its clients' utility usage and analyzes them in light of the applicable regulatory scheme by employing proprietary methods and processes that enable UtiliSave to find its clients savings in the form of exemptions, credits, refunds, or improved rate or service classifications.

Defendant, Donna C. Miele, is a former employee and member of UtiliSave.  In 2000, UtiliSave hired Miele to a senior management position.  As a member of the senior management team, Miele's responsibilities touched on many aspects of UtiliSave's business, including client relations, sales development, human resources, collections, utility auditing, and operations.  In 2006, Miele became an owner and Member of UtiliSave when she, Steifman, and Mikhail Khenin executed the Amended and Restated Limited Liability Company Agreement of UtiliSave, LLC, dated as of January 1, 2006

---

[1]    The facts are drawn from the well-pled allegations of Plaintiff's Verified Complaint (the "Complaint"), which are assumed true for purposes of the Defendant's motion to dismiss, as well as documents integral to the Complaint or incorporated by reference therein.

(the "LLC Agreement").[2] Miele also signed an employment contract, dated as of January 1, 2006 (the "Employment Agreement"), that expired by its terms on January 1, 2008.[3] Miele's Membership in UtiliSave terminated on July 12, 2012, by order of this Court.[4] Miele continued as an employee of UtiliSave until she resigned from the Company in October 2014.

## B.    Facts

The Complaint arises from the terms of the LLC Agreement and, at this stage, turns largely on whether a confidentiality provision therein survived the termination of Miele's membership interest in UtiliSave and is enforceable. The confidentiality provision at issue, if valid and enforceable, prohibits Miele from disclosing or using for her own account anything defined as confidential information "for as long as the Company is engaged in the UtiliSave Business[.]"[5] Plaintiff alleges that Miele, after resigning from UtiliSave, used the Company's confidential information for her own account in breach of the confidentiality provision.

### 1.    The LLC Agreement and its termination

Upon execution of the LLC Agreement, Managing Members Steifman and Khenin each owned 40% of UtiliSave; Miele, a non-managing Member, and a group of Gotham

---

[2]    Def.'s Opening Br. Ex. B (the LLC Agreement).

[3]    Def.'s Opening Br. Ex. C (the Employment Agreement).

[4]    *In re UtiliSave, LLC*, C.A. No. 4441-CS (Del. Ch. July 9, 2012).

[5]    LLC Agreement § 5.05.

3

entities each owned 10%.[6] The LLC Agreement contained a confidentiality provision

(the "Confidentiality Provision"), which stated, in relevant part:

> Each Member acknowledges that the information, observations and data (including, but not limited to, financial information, customer lists, techniques, audit issues, procedure and analysis) obtained by it while a Member of the Company concerning the business or affairs of the Company ("Confidential Information") are the property of the Company. Therefore, each Member agrees that, for as long as the Company is engaged in the UtiliSave Business, it shall not disclose to any unauthorized person or use for its own account any Confidential Information without the unanimous prior written consent of the other Members, unless and to the extent that the aforementioned matters (i) were already in the Member's possession before its association with the Company (including any due diligence period), (ii) become generally known to and available for use by the public other than as a result of the Member's acts or omissions to act or (iii) are required to be disclosed by any court, tribunal or federal or state agency. . . . Each Member shall deliver to the Company at any other time the Company may request, all memoranda, notes, plans, records, reports, computer tapes and software and other documents and data (and copies thereof) relating to the Confidential Information, work product or the business of the Company which it may then possess or have under his control, except for those items that were the property of the Member prior to the commencement of business (including any diligence period) by the Company. This provision shall (i) also be binding on the principals, employees and agents of the Members, *(ii) survive the termination of the Company and (iii) continue to be binding on a Member following the termination of its interest in the Company.*[7]

---

[6] LLC Agreement Schedule A. Steifman owned his stake through a wholly owned entity, MHS Venture. The Gotham entities were Gotham Partners, L.P., Gotham Partners III, L.P., and Gotham Holdings II, LLC.

[7] LLC Agreement § 5.05 (emphasis added).

4

A dispute arose between Steifman and Khenin beginning in 2007; in 2009, Steifman filed a lawsuit against Khenin in New York and commenced a dissolution proceeding in this Court, which was stayed pending resolution of the New York action.[8] After resolution of the New York action, the details of which are not relevant here, the Delaware Court entered an Order Appointing Liquidating Trustee for UtiliSave, LLC, on August 26, 2011.[9] In his Report and Plan of Distribution, the Liquidating Trustee described his authority to pursue, among other things, "the private sale of the Company as a going concern to a Member, a third party or a combination of parties . . . and any other business option utilizing the full range of business judgment."[10] He engaged an investment bank and conducted a market check, but Steifman submitted the only formal bid.[11]

Steifman's bid tracked the terms of the LLC Agreement, which provided "MHS and certain other Members, whose interests were subsequently purchased by MHS, . . . a priority claim on distributions from the Company until such time as the cumulative distributions to those Members exceed $5.25 million . . . ."[12] According to the

---

[8]      Def.'s Opening Br. Ex. D ("Report and Plan of Distribution"); Report and Plan of Distribution Ex. B (*Steifman v. Khenin, et al.*, Index No. 14929/08 (N.Y. Sup. Ct. Westchester Cty.)).

[9]      Report and Plan of Distribution 1.

[10]      *Id.*

[11]      *Id.* at 9-10.

[12]      *Id.* at 10.

5

Liquidating Trustee, Steifman, through MHS, was willing to purchase UtiliSave for up to the value of his priority claim, which equaled $3,434,500 at that time.[13] Based on his priority claim, Steifman's bid required Khenin and Miele to assign to the Company their membership interests and for the Company then to terminate those interests in exchange for Steifman's release of both his priority claim and other claims that he had or may have had against the Company.[14] Rather than require a two-step transaction whereby Steifman would purchase UtiliSave as a going concern and then distribute his priority claim back to himself, the Liquidating Trustee recommended, and the Court approved, Steifman's proposal.[15] Thus, the Court ordered, among other things: "Donna Miele's interests in the Company are canceled effective the date of this Order, and she shall deliver any certificates representing such interests to the Liquidating Trustee within five (5) business days of the date of this Order."[16]

Consistent with the Court's Order, Miele executed an Assignment and Termination of Membership Interest, dated as of July 12, 2012 (the "Assignment Agreement").[17] In relevant part, the Assignment Agreement states as follows:

---

[13]    *Id.*

[14]    *Id.*

[15]    *In re UtiliSave, LLC,* C.A. No. 4441-CS (Del. Ch. July 9, 2012).

[16]    *Id.* at 2.

[17]    Def.'s Opening Br. Ex. E (the Assignment Agreement).

6

RECITALS

A.    Assignor [Miele] and Assignee [UtiliSave] entered into [the LLC Agreement].

B.    Pursuant to the [LLC] Agreement, Assignor owns a membership interest in Utilisave [sic], together with certain rights, interests and obligations (collectively, the "LLC Interest").

C.    Assignor has been required by Court Order to assign and transfer the LLC Interest to Assignee.

AGREEMENTS

1.    <u>Assignment and Termination.</u>  Assignor hereby grants, conveys, assigns and transfers unto Assignee the LLC Interest.  Effective upon the execution and delivery of this Assignment, Assignor's Membership Interest (as defined in the Agreement) shall automatically terminate, and the internal records of Utilisave [sic] shall be updated to reflect the Membership Interest of Assignor as having been liquidated, terminated and retired for all purposes.

2.    <u>No Further Capital Contributions.</u>  Assignor is hereby released from any and all obligations to make further capital contributions in connection with the Agreement and/or the Project (as defined in the Agreement).[18]

Miele continued working for UtiliSave for another two years until she verbally informed Steifman that she intended to retire around the end of the summer in 2014. Steifman convinced Miele to consult from home on a part-time basis effective August 1, 2014. In mid-October, however, Miele permanently resigned from UtiliSave. Plaintiff

---

[18]    Assignment Agreement.

7

complains that, in or around January 2015, Miele used UtiliSave's Confidential Information in breach of the Confidentiality Provision.

## 2. UtiliSave's Confidential Information

The LLC Agreement defines Confidential Information in the case of a Member, like Miele, to include "information, observations and data (including, but not limited to, financial information, customer lists, techniques, audit issues, procedure and analysis) obtained . . . while a Member of the Company concerning the business or affairs of the Company[.]"[19] UtiliSave focuses on three particular types of Confidential Information: the GRT Process, billing records, and client lists.

As stated previously, UtiliSave collects tens of millions of pieces of data regarding its clients' utility usage and analyzes them in light of the applicable regulatory scheme by employing proprietary methods and processes that enable the Company to find its clients savings. In particular, UtiliSave developed and uses a unique, proprietary, and valuable auditing process that secures for its clients refunds relating to the gross receipts tax that utilities pass on to their customers (the "GRT Process"). Although not stated expressly in the Complaint, I infer that UtiliSave employs computer software to collect and analyze this voluminous data, which reflects a unique, proprietary, and valuable auditing process.[20] Plaintiff alleges this process is known to Miele, but they do not allege that

---

[19]    LLC Agreement § 5.05.

[20]    Plaintiff alleges that "[t]here is no off-the-shelf software that would enable someone outside of UtiliSave to perform a similar analysis or achieve similar results . . . ." Compl. ¶ 7.

Miele took any computer hardware or software with her when she left the Company. Second, UtiliSave considers its billing records proprietary and confidential because they include descriptions of savings and unique analytical methods and processes. Finally, UtiliSave views its client list as confidential. This list, cultivated over the last twenty-four years, includes not only the names of large institutions with tens of thousands of compartmentalized employees, but also valuable contacts within these institutions that enable UtiliSave to cut through layers of bureaucracy and go straight to the decision-maker.

UtiliSave alleges that it takes steps to protect its confidential information by requiring, among other things, its employees and customers to sign comprehensive confidentiality agreements that prohibit the disclosure or use of any non-public information belonging to UtiliSave. For example, because its billing records include descriptions of savings and unique analytical methods and processes, UtiliSave's customer contracts include a non-disclosure clause prohibiting the customer from disclosing any of the Company's work product, such as utility usage analysis, areas of savings, and auditing procedures. In addition, UtiliSave does not publish the names of its client contacts or similar information on its website or disclose it in other marketing materials.

### 3. Miele contacts one of UtiliSave's longstanding clients

While an owner and senior manager of UtiliSave, Miele had access to nearly all of UtiliSave's confidential and proprietary information, including, without limitation, pricing information, client lists, marketing strategies, and trade secrets, such as the GRT

Process and other proprietary auditing methods and processes. On January 26, 2015, approximately three months after Miele resigned, a high-level executive of a former client informed Steifman that Miele recently had formed her own utility auditing business. On January 28, UtiliSave sent a letter to Miele requesting that she confirm or deny what the Company had learned and informing her that it would interpret a nonresponse as an admission that Miele was competing or planning to compete against UtiliSave. Miele had not responded to this letter as of the filing of the Complaint.

On February 9, 2015, Steifman learned from a high-level source within New York University Langone Medical Center ("NYUMC"), a longstanding and valuable client of the Company, that Miele had solicited him for NYUMC's utility auditing business and that he had agreed to meet with her to discuss that subject.

### C. Procedural History

UtiliSave filed the Complaint against Miele, alleging claims for specific performance and breach of contract and seeking certain equitable, injunctive and monetary relief, on February 27, 2015. The Company also moved to expedite this action on the same day. On April 6, the Court entered a negotiated Stipulated Status Quo and Scheduling Order. Defendant filed her motion to dismiss on April 10 and I heard oral argument on that motion on May 12. This is my ruling on that motion.

### D. Parties' Contentions

Count I of the Complaint seeks specific performance of Defendant's obligations under the Confidentiality Provision. Count II seeks unspecified compensatory damages for economic harm that Miele allegedly caused UtiliSave. In support of her motion to

10

dismiss the Complaint in its entirety, Miele contends that the contractual provision from which the Plaintiff's cause of action arises is invalid and unenforceable for two reasons. First, she asserts that the only reasonable interpretation of the Assignment Agreement is that, by its plain terms, the agreement terminated all of her obligations under the Confidentiality Provision for all purposes as of July 12, 2012. Second, Miele argues that, even if the Assignment Agreement did not terminate her obligations under the Confidentiality Provision, that provision itself is unenforceable because it is overbroad and unreasonable. Next, Defendant contends that the Complaint fails to plead any facts that, if true, would prove Miele breached the Confidentiality Provision. Finally, Miele avers that UtiliSave failed to plead damages adequately, and, in any event, the contractual remedies upon which Plaintiff relies were terminated by the Assignment Agreement.

In opposing Defendant's motion to dismiss, UtiliSave contends that the Confidentiality Provision explicitly states that it will "survive the termination of the Company and . . . continue to be binding on a Member following the termination of [her] interest in the Company." In addition, Plaintiff denies Miele's assertion that it is seeking to enforce the Confidentiality Provision as a de facto non-compete or non-solicitation covenant and maintains that, in any event, such a fact-intensive issue cannot be resolved on a motion to dismiss. Finally, Plaintiff argues that the Complaint not only pleads facts sufficient to prove that a breach has occurred already, but also demonstrates through language in the LLC Agreement that UtiliSave is entitled to equitable and monetary remedies for any such breach or threatened breach.

11

## II.     ANALYSIS

For this Court to conclude that certain of Miele's actions violated UtiliSave's rights, it is first necessary to identify the source or sources of the rights that Plaintiff seeks to enforce. The Complaint refers only to the LLC Agreement and neither quotes nor mentions the terms of Miele's Employment Agreement, which expired by its terms on January 1, 2008.[21] Alternatively, Plaintiff presumably could have sought relief for alleged violations of its rights arising from the fact of Miele's employment, which continued until 2014, but there are no allegations in the Complaint or even the briefing to that effect. Thus, I find that the Complaint and Plaintiff's briefing seek only to enforce its rights as provided for in the LLC Agreement. Accordingly, I limit my analysis to UtiliSave's rights stemming from that document.

### A.     Standard of Review

Pursuant to Rule 12(b)(6), this Court may grant a motion to dismiss for failure to state a claim if a complaint does not assert sufficient facts that, if proven, would entitle the plaintiff to relief. The Supreme Court has made clear that "the governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'"[22] That is, when considering such a motion, a court must "accept all well-pleaded factual allegations in the Complaint as true, . . . draw all reasonable inferences in favor of the

---

[21]     Employment Agreement § 2.01 ("Commencing on [January 1, 2006], through the earlier of (a) January 1, 2008 and (b) the termination of your employment as provided in Article III below (the "Contract Period").)

[22]     *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011) (footnote omitted).

12

plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[23]

This reasonable "conceivability" standard asks whether there is a "possibility" of recovery.[24] If the well-pled factual allegations of the complaint would entitle the plaintiff to relief under a reasonably conceivable set of circumstances, the court must deny the motion to dismiss.[25] The court, however, need not "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[26] Moreover, failure to plead an element of a claim precludes entitlement to relief and, therefore, is grounds to dismiss that claim.[27]

Generally, the Court will consider only the pleadings on a motion to dismiss under Court of Chancery Rule 12(b)(6). "A judge may consider documents outside of the pleadings only when: (1) the document is integral to a plaintiff's claim and incorporated in the complaint or (2) the document is not being relied upon to prove the truth of its contents."[28] Thus, if documents that are integral to and incorporated by reference into

---

[23] *Id.* at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002)).

[24] *Id.* at 537 & n.13.

[25] *Id.* at 536.

[26] *Price v. E.I. duPont de Nemours & Co., Inc.*, 26 A.3d 162, 166 (Del. 2011) (citing *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)).

[27] *Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963, 972 (Del. Ch. 2000) (Steele, V.C., by designation).

[28] *Allen v. Encore Energy P'rs*, 72 A.3d 93, 96 n.2 (Del. 2013).

13

plaintiff's complaint effectively negate the claim as a matter of law, dismissal is appropriate.[29]

Here, to adequately plead a claim for breach of contract, UtiliSave must plead facts sufficient to support a reasonable inference that: (1) Miele is bound by a valid, enforceable contract; (2) she breached her obligations under the terms of that contract; and (3) Plaintiff suffered damages.[30] Defendant challenges the sufficiency of the Complaint as to each of these three elements.

## B.    Is the Confidentiality Provision Valid and Enforceable?

The interpretation of the Confidentiality Provision is a question of law.[31] "[D]efendants are not entitled to dismissal under Rule 12(b)(6) unless the interpretation of the contract on which their theory of the case rests is the 'only reasonable construction as a matter of law.'"[32]    Here, Defendant's first theory of the case rests on her interpretation that the Assignment Agreement plainly terminated all aspects of the LLC Agreement, including the Confidentiality Provision. If there is more than one reasonable

---

[29]    *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001).

[30]    *eCommerce Indus., Inc. v. MWA Intelligence, Inc.*, 2013 WL 5621678, at \*13 (Del. Ch. Sept. 30, 2013).

[31]    *See, e.g.*, *Seidensticker v. Gasparilla Inn, Inc.*, 2007 WL 4054473, at \*2 (Del. Ch. Nov. 8, 2007) (citing *HIFN, Inc. v. Intel Corp.*, 2007 WL 1309376, at \*9 (Del. Ch. May 2, 2007)); *see also AHS N.M. Hldgs., Inc. v. Healthsource, Inc.*, 2007 WL 431051, at \*3 (Del. Ch. Feb. 2, 2007) ("Under general principles of contract law, interpretation of contractual language is purely a question of law.").

[32]    *Kahn v. Portnoy*, 2008 WL 5197164, at \*3 (Del. Ch. Dec. 11, 2008) (quoting *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 615 (Del. 2003)).

construction of contractual language, then the contract is ambiguous.[33]   Contractual

language, however, "is not ambiguous simply because the parties disagree on its

meaning."[34]   Instead, the court will apply standard principles and canons of construction

in construing the contract.

Delaware follows the objective theory of contracts "under which a contract is

construed as it would be understood by an objective, reasonable third-party."[35]   "Where

contract language is 'clear and unambiguous,' the ordinary and usual meaning of the

chosen words will generally establish the parties' intent."[36]   Ambiguity exists "when the

provisions in controversy are reasonably or fairly susceptible [to] different interpretations

or may have two or more different meanings."[37]   "Under general principles of contract

law, a contract should be interpreted in such a way as to not render any of its provisions

illusory or meaningless."[38]   "Contract terms are not read in isolation, but must be read in

---

[33]   *VLIW Tech.*, 840 A.2d at 615 ("Ambiguity exists 'when the provisions in controversy are reasonably or fairly susceptible of different interpretations.'" (quoting *Vanderbilt Income & Growth Assocs. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996))).

[34]   *E.I. du Pont de Nemours & Co., Inc. v. Allstate Ins. Co.,* 693 A.2d 1059, 1061 (Del. 1997).

[35]   *Matthew v. Laudamiel*, 2012 WL 2580572, at *5 (Del. Ch. June 29, 2012).

[36]   *W. Willow–Bay Court, LLC v. Robino–Bay Court Plaza, LLC,* 2007 WL 3317551, at *9 (Del. Ch. Nov. 2, 2007), *aff'd,* 985 A.2d 391 (Del. 2009).

[37]   *Rhone–Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.,* 616 A.2d 1192, 1196 (Del. 1992) (citation omitted).

[38]   *Sonitrol Hldg. Co. v. Marceau Investissements*, 607 A.2d 1177, 1183 (Del.1992).

15

the context of the contract and in light of the Parties' reasonable expectations going into that agreement."[39]

1.      **Did the Assignment Agreement terminate the Confidentiality Provision?**

As the moving party, Miele has the burden of showing hers is the only reasonable interpretation. Because I find both Defendant's and Plaintiff's interpretations are reasonable, Defendant has failed to carry this burden.

Defendant's contention that the Confidentiality Provision terminated when she assigned her LLC Interest back to UtiliSave in August 2012 arguably is reasonable. The Assignment Agreement defines Miele's LLC Interest to be her "membership interest in UtiliSave, together with certain rights, interests and obligations" and provides that Miele "has been required by Court Order to assign and transfer the LLC Interest to [the Company]."[40] It also provides that Miele's "Membership Interest (as defined in the [LLC] Agreement) shall automatically terminate, and the internal records of UtiliSave shall be updated to reflect the Membership Interest of [Miele] as having been liquidated, terminated and retired for all purposes."[41] Finally, as Defendant points out, the Assignment Agreement does not preserve or carve out explicitly the Confidentiality Provision, or any other provision for that matter.

---

[39]     *Seibold v. Camulos P'rs LP*, 2012 WL 4076182, at *9 (Del. Ch. Sept. 17, 2012).

[40]     Assignment Agreement, Recitals B-C.

[41]     Assignment Agreement § 1.

16

Miele also presents a colorable argument that the drafting parties' inclusion of the word "obligations" in the definition of LLC Interest evidences their intent for all of her obligations under the Assignment Agreement, including the Confidentiality Provision, to terminate "for all purposes." If UtiliSave had intended for any obligations to survive termination, they easily could have drafted specific language to carve them out of the Assignment Agreement. Thus, I decline Plaintiff's invitation to apply selectively the *expressio unius est expressio alterius* canon to find that Section 2 of the Assignment Agreement only terminated Defendant's financial obligations under the LLC Agreement. Defendant argues that this would create surplusage and lead to the absurd result that all of Defendant's other obligations under the LLC Agreement also survived. Plaintiff responds to this argument, in part, by contending that the recitals must be ignored because they are not contract terms. "Generally, recitals are not a necessary part of a contract," but they can be useful to explain the intended meaning of other terms.[42] Here, the recitals appear to include substantive, definitional language that is consistent with the Assignment Agreement and should not be ignored. Nevertheless, I also consider it reasonably conceivable that the parties intended Section 2 to be a "belt and suspenders" confirmation that Miele owes no further financial obligations under the LLC Agreement.

UtiliSave's interpretation that the Confidentiality Provision survived termination is also reasonable. The question before me is whether the Assignment Agreement was

---

[42] *Bennett v. Lally*, 2014 WL 4674623, at *6 (Del. Ch. Sept. 5, 2014); *New Castle Cty. v. Crescenzo*, 1985 WL 21130, at *3 (Del. Ch. Feb. 11, 1985).

17

intended to terminate Miele's obligations under the Confidentiality Provision notwithstanding the Confidentiality Provision's plain language that it would survive such termination. UtiliSave argues that the Assignment Agreement did not terminate the LLC Agreement, but is a superseding contract with independent rights that must be reconciled with the LLC Agreement.[43] Because I find that UtiliSave's plain language reading of the Confidentiality Provision is reasonable, however, I do not consider here whether or to what extent the Assignment Agreement superseded the LLC Agreement in its entirety.

Thus, I conclude that both interpretations are reasonable and that the resulting ambiguity is incapable of reconciliation at this stage of the proceedings. Here, the plain language of the provisions at issue is reasonably susceptible of two interpretations, each favoring a different party: the Confidentiality Provision states that it survives termination of the Company and Miele's interest and the Assignment Agreement states that it terminates the LLC Agreement without clarifying whether that includes the Confidentiality Provision or not. Because it is reasonably conceivable that Plaintiff's interpretation will prevail, I assume that interpretation is correct for the balance of this opinion.

Before moving on, I address briefly Miele's argument that equity requires any ambiguity in the Assignment Agreement to be construed against UtiliSave as the drafter,

---

[43] A new contract relating to the subject matter of the former agreement does not destroy the obligation of the former agreement, except as it is inconsistent therewith, unless it is shown that the parties intended the new contract to supersede the old contract entirely. *See Lee Builders, Inc. v. Wells*, 92 A.2d 710, 715 (Del. Ch. 1952).

rather than against her, the minority member who involuntarily assigned and transferred her interest back to the Company for no consideration. At this stage, I consider it premature to construe the Assignment Agreement against UtiliSave as the drafter or to assume that Miele received no consideration. The dissolution proceedings followed a dispute between Steifman and Khenin and were conducted by a liquidating trustee. Although Miele was not a party to those proceedings, I cannot determine on this record whether she did, or at least had an opportunity to, contribute to the drafting of the Assignment Agreement. For example, Khenin objected to the trustee utilizing an assignment of membership interests and argued that the trustee should conduct an asset sale instead.[44] Finally, it is reasonably conceivable that, on a more developed record, Plaintiff's interpretation will be the only reasonable interpretation, making the application of *contra proferentem* inappropriate and unnecessary.[45]

### 2. Is the Confidentiality Provision overbroad and unreasonable?

#### a. Validity as to Miele's alleged breach

For UtiliSave to survive a motion to dismiss, it must assert a claim for breach of contract. As discussed *infra*, UtiliSave pled adequately at least one non-conclusory breach of the Confidentiality Provision. That is, it is reasonable to infer from the facts alleged in the Complaint that Miele obtained UtiliSave's confidential client contact

---

[44]    Report and Plan of Distribution 7 n.4.

[45]    *See Zimmerman v. Crothall*, 62 A.3d 676, 698 (Del. Ch. 2013) (applying *contra proferentem*, a rule of "last resort," on a complete factual record established at trial).

19

information regarding NYUMC during the six years she was a Member and that she set up a meeting using that information for the purpose of competing with UtiliSave.

I am not persuaded that there is anything overbroad or unenforceable about the LLC Agreement as to this claim. First, the Confidentiality Provision contains terms that appear to be aimed at preserving Miele's ability to compete reasonably by, for example, carving out information "generally known to the public" or obtained by Miele before her association with UtiliSave.[46] Second, the alleged breach occurred just over two years after Miele ceased to be a Member. Thus, it is reasonable to infer that the information was not stale at that time. Third, I am convinced that UtiliSave reasonably could show that enforcing the Confidentiality Provision against Miele protects UtiliSave's legitimate economic interests and does not unduly burden Miele. Finally, the parties appear to be competing in the same geographic area.

Therefore, I conclude it is reasonably conceivable that the Confidentiality Provision is not overbroad or unreasonable as to Miele's well-pled breach through the use of UtiliSave's confidential client contact information.

---

[46] UtiliSave alleges the information in question is not generally known. As discussed *infra*, this is a fact issue incapable of resolution at this stage. I also find unpersuasive Miele's reliance on *Seibold* for the proposition that the Confidentiality Provision does not apply to her because she did not obtain the information at issue in her capacity as a Member, but as an employee. In *Seibold*, after a trial on the merits, the court found no support in the evidence that Seibold had used confidential information to contact prospective clients. In addition, the employment contract there was governed by New York law. *Seibold*, 2012 WL 4076182, at *11, *14. Thus, *Seibold* is inapposite in the context of Defendant's motion to dismiss.

## b. Validity as a matter of law

I also am not persuaded by Miele's argument that the Confidentiality Provision as a whole is unenforceable as a matter of law. Miele contends that the Confidentiality Provision is invalid and unenforceable as a matter of law because UtiliSave seeks to convert a purportedly perpetual confidentiality clause into perpetual non-compete and non-solicitation obligations. In support of her argument, Miele suggests the following syllogism:

> To be enforceable, non-competition and non-solicitation obligations must be reasonable in geographic scope and temporal duration, advance a legitimate economic interest of the party seeking its enforcement, and survive a balancing of the equities. UtiliSave seeks to enforce a "Perpetual Confidentiality Clause" that lacks geographic and temporal limitations, does not advance a legitimate economic interest, and unreasonably burdens Miele. Therefore, the Perpetual Confidentiality Clause is invalid and unenforceable as a matter of law.

UtiliSave overplays its hand by describing the Confidentiality Provision as "perpetual" throughout its brief, although not to the extent urged by Miele. If UtiliSave intends "perpetual" to mean the Confidentiality Provision would survive the termination of the Company and of Miele's Interest, I determined *supra* that such an outcome is reasonably conceivable. But, if UtiliSave intends "perpetual" to also mean that the Confidentiality Provision prohibits Miele from using or disclosing UtiliSave's confidential information in perpetuity, that is far less clear.[47] In fact, not only does

---

[47] It is unclear, for example, whether UtiliSave has alleged it has something here that deserves "perpetual" protection. In that regard, the Coke formula comes to mind,

21

"UtiliSave readily acknowledge[] Defendant's right to lawfully engage in competitive activity," but the LLC Agreement itself limits the temporal duration of the Confidentiality Provision to the time period in which UtiliSave continues its line of business. Thus, I disagree with Miele's characterization of UtiliSave's argument and instead interpret UtiliSave to be alleging that the nature of some of UtiliSave's confidential information is such that Miele could not work for a competitor or compete with UtiliSave without breaching the Confidentiality Provision.

Despite clear differences between confidentiality and non-competition provisions, confidentiality provisions begin to operate more like non-competes in an inevitable disclosure situation. Although the facts here are far less egregious, the facts of *W.L. Gore & Associates, Inc. v. Wu* provide a useful example of inevitable disclosure.[48] There, after the defendant, Wu, admitted to allegations that, among many other things, he had breached contractual non-compete and confidentiality obligations owed to his former employer and the plaintiff, Gore, the court entered a Consent Judgment "permanently enjoin[ing] Wu from disclosing or using any confidential, proprietary or trade secret

---

but even in that case the term "perpetual" would depend on the formula continuing to be secret and valuable, which it apparently continues to be today. The more the information in question approaches or can be considered being a trade secret, the longer the period of enforced confidentiality is likely to be. Here, UtiliSave has pled sufficient facts that at least some of its information, such as the GRT Process, is conceivably in that category. I cannot say on the current record that, as a matter of law, the Confidentiality Provision is reasonable or unreasonable, but to defeat a motion to dismiss on that basis, UtiliSave only has to show that it *may be* reasonable, not that it definitively is.

[48]    2006 WL 2692584 (Del. Ch. Sept. 15, 2006).

22

research, information, know-how, or material of Gore that Wu worked on or with during his employment with Gore."[49] After a trial on the merits as to whether and to what extent additional injunctive relief would be necessary, the court concluded that, "if [Wu] were to work at another company having polymer technology or products similar to Gore's, there is a significant risk that Wu would disclose Gore trade secrets, notwithstanding the Consent Judgment."[50] In support, the court found that "Wu cannot 'unlearn' what he learned while working at Gore. If he is allowed to work with Listed Polymers, his extensive knowledge would almost certainly filter into his work and result in disclosure of Gore trade secrets."[51] On what were admittedly far more egregious facts than those alleged here, the court entered a ten-year injunction preventing Wu from engaging in a wide range of conduct related to his activities at Gore.

UtiliSave advances a colorable inevitable disclosure argument, which alleges that Miele knew the Company's confidential GRT Process and, in attempting to compete with UtiliSave, would inevitably use or disclose their trade secrets.[52] First, the Complaint alleges that Miele had access to and high level knowledge of valuable, confidential information while a Member and employee of UtiliSave. Although it is not a breach

---

[49] *Id.* at *1.

[50] *Id.* at *13.

[51] *Id.* at *14.

[52] The Complaint alleges that "it is implausible that Miele could provide auditing utility services comparable to UtiliSave without divulging or using UtiliSave's confidential information." Compl. ¶ 37.

23

simply to know this information, whether Miele knows it is a factual issue that UtiliSave conceivably could prove at trial. I find such an inference is reasonable. Second, the Complaint alleges that the GRT Process and client contact information are valuable and confidential. Miele avers that most elements of the GRT Process and the identities of UtiliSave's clients are publicly available. Whether the components of an alleged trade secret are generally known or ascertainable, however, is also a fact-intensive question that is ill-suited for determination at the pre-discovery stage.[53] Further, for purposes of the pending motion, I need not decide whether the identities of UtiliSave's clients are publicly known, because I have concluded that UtiliSave adequately has alleged that their detailed contact information regarding a particular client is valuable and protected. Finally, whether Miele can compete with UtiliSave without using or disclosing what she knows presents yet another factual issue.

UtiliSave also has alleged enough facts that, under reasonably conceivable circumstances, enforcing the Confidentiality Provision against Miele would advance UtiliSave's legitimate economic interests without unduly burdening Miele. If this Court enjoined Miele from using UtiliSave's trade secrets, the injunction likely would be limited to a period of time long enough to enable Miele or her agents to develop the trade

---

[53] *Savor*, 812 A.2d at 897. Even assuming the general elements of the GRT Process are publicly known, however, that does not rule out the possibility of a trade secret or proprietary, confidential information. For example, there may be dozens of utility audit processes, but UtiliSave alleges its process is the best and most efficient.

secrets by legitimate means.[54] These allegations raise a factual dispute as to Miele's knowledge of UtiliSave's GRT Process, whether she could compete with UtiliSave without using or disclosing that knowledge, and how long an injunction should last.

Thus, regardless of which test I apply, Miele's arguments depend on factually intensive issues incapable of resolution on a motion to dismiss.[55] At this preliminary stage, I cannot find here that the Confidentiality Provision is invalid as a matter of law because it lacks a temporal limit; assessment of that question must await the development of a more complete factual record. Miele's alleged breach occurred just over two years after the Assignment Agreement terminated the LLC Agreement, so her burden is to show that under no reasonably conceivable circumstances could UtiliSave prove that the Confidentiality Provision survived more than two years. She has not done so.

### C. Did Miele Breach the Confidentiality Provision?

Drawing all reasonable inferences in favor of Plaintiff, it is reasonably conceivable that Miele breached the Confidentiality Provision. Defendant argues that

---

[54] *See Merck & Co. v. SmithKline Beecham Pharm. Co*., 1999 WL 669354, at \*25 (Del. Ch. Aug. 5, 1999), *aff'd*, 746 A.2d 277 (Del. 2000) and *aff'd*, 766 A.2d 442 (Del. 2000) ("An injunction should last for as long as is necessary, but no longer than is necessary, to eliminate the commercial advantage or 'lead time' with respect to good faith competitors that a person has obtained through misappropriation." (quoting UNIFORM TRADE SECRETS ACT (U.L.A.) § 2 Comments at 450 (1979))); *Kan-Di-Ki, LLC v. Suer*, 2015 WL 4503210, at \*28 (Del. Ch. July 22, 2015) (limiting an injunction to approximate the amount of time the defendant would have been subject to restrictive covenants after the breach at issue).

[55] *Savor*, 812 A.2d at 897 ("The short answer to these arguments is that, at this stage of the proceedings, Savor gets the benefit of all favorable inferences.").

25

UtiliSave fails to support its conclusory allegations of Miele's purported breach with any facts indicating that Miele's alleged activities will result in her "using" or "disclosing" UtiliSave's confidential information. The Complaint puts three categories of confidential information at issue: the GRT Process, UtiliSave's billing records, and UtiliSave's client list. Plaintiff failed to plead non-conclusory facts, however, that, if true, would prove Miele actually breached the Confidentiality Provision—with one exception.

Plaintiff alleges that on February 9, 2015, Steifman learned from a high-level source within NYUMC, a longstanding and valuable client of UtiliSave, that Miele solicited him for NYUMC's utility auditing business and that he agreed to meet with Miele for that purpose. Defendant protests that "[t]he *one* meager Complaint allegation UtiliSave relies on is that Ms. Miele's purported solicitation of NYUMC 'demonstrates that she already is using UtiliSave's confidential information,' but UtiliSave fails to allege how, when or why this unreasonable inference is supported."[56] I disagree. In my view, no such additional allegation is necessary. Based on the allegations in the Complaint, it is reasonable to infer: (1) that Miele knew who to contact at NYUMC to solicit utility auditing business from working at UtiliSave for over ten years, and being a Member of the Company from 2006 to 2012; (2) that the information regarding that contact was valuable Confidential Information of UtiliSave; and (3) that Miele used that information to benefit her fledgling competing business.

---

[56] Def.'s Reply Br. 10 (emphasis original).

26

Defendant further argues that this allegation is insufficient because the Complaint does not allege clearly that a meeting actually took place. Again, no such additional allegation is necessary. Taking the factual allegations as true, Miele used UtiliSave's confidential information for her own account, which the Confidentiality Provision expressly prohibits. Therefore, I conclude that the Complaint pleads adequately that Miele breached the Confidentiality Provision by using UtiliSave's client list.

### D. Did UtiliSave Suffer Harm?

I find UtiliSave pled sufficient facts to support the equitable remedy sought in Count I. UtiliSave failed, however, to plead facts supporting a reasonable inference that Miele's breach caused the Company economic harm. Thus, Defendant's motion to dismiss must be granted as to Count II.

My analysis of this issue is framed by the well-pled allegations in the Complaint. As explained *supra,* UtiliSave's Complaint will survive Miele's motion to dismiss because it is reasonably conceivable that Miele used UtiliSave's client list, which the Confidentiality Provision defines as Confidential Information, for her own account. But the Complaint otherwise fails to plead facts supporting an inference that Miele's breach caused UtiliSave economic harm. For example, the Complaint fails to plead that Miele's alleged breach caused UtiliSave to increase its spending on marketing or to offer its existing customers a discount to retain their business or that UtiliSave lost any business or incurred any additional expenses of any kind. To the contrary, UtiliSave's bald assertion that "Miele's ongoing violations of the Confidentiality [Provision] has caused

27

and will continue to cause UtiliSave economic harm . . ."[57] is a perfect example of a conclusory allegation that this Court may ignore on a motion to dismiss.[58]

Nevertheless, Defendant's motion to dismiss must be denied as to Count I. Section 8.07 of the LLC Agreement states:

> [t]he Members acknowledge that if any of the Members should breach or threaten to breach any provisions of this Agreement, the Company will suffer irreparable injury; and therefore the Company and such non-breaching Members may . . . seek from any court of competent jurisdiction specific performance of the provisions of this Agreement or injunctive relief against any act which would violate any of its provisions.[59]

UtiliSave pled that it faces an imminent threat of irreparable harm because Miele has solicited utility auditing work from UtiliSave's contact at NYUMC. It is reasonably conceivable that Miele's alleged use of contact information in the Company's client list for her own account breached a purportedly valid, enforceable contract. Because UtiliSave pled the existence of an agreement between the parties under which such a breach would cause irreparable injury justifying specific performance of the provision at issue, I find it is also reasonably conceivable that UtiliSave will prove entitlement to such specific performance.

---

[57] *Id.*

[58] *Price*, 26 A.3d at 166.

[59] LLC Agreement § 8.07. Because I conclude above that the Complaint pled adequately the existence of a valid, enforceable contract, I disregard, for purposes of her motion to dismiss, Miele's argument that the Assignment Agreement terminated UtiliSave's contractual remedy.

28

### III.    CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss the Complaint is denied

as to Count I and granted as to Count II.

**IT IS SO ORDERED**.